# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **SAMUEL OLATUBOSUN,** | ) | **CASE NO. 8:09CV376** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **MICHAEL J. ASTRUE, as** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Now before the Court is the Complaint of Plaintiff Samuel Olatubosun.  (Filing No. 1.)  Olatubosun seeks review of the Commissioner of the Social Security Administration's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 *et seq.*   The Court has carefully considered the transcript of the administrative record (Filing No. 10) and the parties' briefs (Filing Nos. 12 and 15).  For the following reasons, the Commissioner's decision will be affirmed.

## PROCEDURAL BACKGROUND

Olatubosun filed his application for disability benefits on June 28, 2006.  (Tr. at 53-57.)  After his application was denied initially (*id.* at 35, 48-51) and on reconsideration (*id.* at 33, 43-46), he requested a hearing before an administrative law judge ("ALJ") (*id.* at 31).  This hearing was held on November 10, 2008 (*id.* at 409, 411), and in a decision dated February 27, 2009, the ALJ concluded that Olatubosun was not entitled to disability insurance benefits (*id.* at 14-24).  Olatubosun then requested that the Appeals Counsel of the Social Security Administration review the ALJ's decision.  (*Id.* at 10.)  This request was denied on August 19, 2009 (*id.* at 6-9); therefore, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## FACTUAL BACKGROUND

Olatubosun alleges that he became disabled on March 23, 2006, due to seizures, high blood pressure, a history of heart problems, sleep apnea, depression, posttraumatic stress disorder (PTSD), and conversion disorder.  (Tr. at 53, 76, 120, 412.)  He was born in May 1962 in Lagos, Nigeria, and he was 43 years old on the date of his alleged onset of disability.  (*Id.* at 23, 53, 234.)  He graduated from high school in Nigeria, and he has four years of college education in accounting.  (*Id.* at 412.)  While serving in the Nigerian army from 1979 to 1993, Olatubosun suffered gunshot wounds to the head, leg, and shoulder.  (*Id.* at 122, 233-34, 286, 308.)  He was also imprisoned by the Nigerian government and tortured.  (*Id.* at 233-34.)  After moving to the United States in May 1997, he worked as a production assembler, materials handler, inserting machine operator, security guard supervisor, security guard, nurse aide, retail clerk, home health aide, accounting clerk, and employment staffing coordinator.  (*Id.* at 22-23, 62-70, 126-128, 232.)

***Medical Evidence***

Records indicate that Olatubosun has suffered from seizures since he sustained a gunshot wound to the head in 1984.  (*E.g.*, Tr. at 178.)  This review of the medical evidence will focus on records dating back to (approximately) March 2006, which is the alleged disability onset date.

On February 16, 2006, Olatubosun visited the Nebraska Medical Center in Omaha after suffering three seizures during the previous night.  (Tr. at 172.)  He reported that he had not taken his medicines for the past three weeks because "he can't afford it."  (*Id.*)  Olatubosun and his wife were instructed about the importance of the medication, and they agreed that they would be able to pay for the medication going forward.  (*Id.*)

2

On or about February 20, 2006, Olatubosun returned to the Nebraska Medical Center after suffering two seizures–both of which were witnessed by his wife. (Tr. at 307.) Nursing notes suggest that Olatubosun was "rude" and "offensive" but also cooperative while at the hospital. (*Id.*)

On March 10, 2006, Olatubosun visited the Nebraska Medical Center for a follow-up regarding his blood pressure. (Tr. at 171.) His physician, Dr. Stephen Tibbels, noted that Olatubosun's hypertension was well-controlled, and Olatubosun was directed to return for another follow-up in six months. (*Id.*)

Olatubosun returned to Dr. Tibbels for a follow-up on May 24, 2006. (Tr. at 170.) Olatubosun reported that "he went for a job interview . . . [and] they did a job physical and . . . told [him] that his blood pressure was too high and he needed to follow up here . . . to get an okay to work." (*Id.*) Dr. Tibbels told Olatubosun that he "saw no reason that he could not work with [his] current blood pressure," but he increased Olatubosun's medication because his "blood pressure [was] trending a little bit upward again." (*Id.*) On June 9, 2006, Dr. Tibbels signed a "Certificate to Return to Work" stating that Olatubosun could not drive for six months "due to uncontrolled seizures." (*Id.* at 152.)

In a letter dated July 14, 2006, Dr. Ronald Cooper informed Dr. Sanjay Singh that Dr. Cooper had arranged an appointment for Olatubosun to visit Dr. Singh in his clinic. (Tr. at 219.) Dr. Cooper wrote that Olatubosun was suffering one to two seizures per week, which "caused him to lose jobs." (*Id.*) Dr. Cooper also noted that "MRI scanning of [Olatubosun's] brain and EEG's have been normal in the past," and he expressed hope that Dr. Singh would make a "further evaluation to help define [the] seizures and . . . [monitor Olatubosun] for true seizure activity." (*Id.*)

3

Olatubosun reported to Dr. Cooper that he experienced seizures on August 7, 12, 14, 17, and 24, 2006.  (Tr. at 305; *see also id.* at 3 (indicating that page 305 is a progress note by Dr. Cooper).)  Meanwhile, on August 12, 2006, Olatubosun's wife completed an information form for the Social Security Administration.  (*Id.* at 84.)  On this form, she reported that Olatubosun interacts very well with people, respects authority, and "can usually accept criticism from an employer."  (*Id.*)  She also commented on Olatubosun's adaptability, noting that he came to the United States "as a political refugee," "start[ed] a new life," and "learn[ed] a new culture."  (*Id.*)  She added, however, that Olatubosun's seizures were unpredictable and caused him to suffer soreness, weakness, headaches, and a loss of appetite.  (*Id.*)  She wrote that when Olatubosun suffered a seizure, he had to spend most of the day in bed.  She added, "We can't plan ahead for things anymore because we don't know what to expect when he [wakes] up each morning or when he go[es] to bed at night."  (*Id.*)

On September 11, 2006, Dr. Glen D. Knosp reviewed the available records about Olatubosun and completed a physical residual functional capacity assessment form.  (*See* Tr. at 141-148.)  He opined that Olatubosun had no exertional, manipulative, visual, or communicative limitations.  (*Id.* at 142, 144-145.)  He also opined that Olatubosun was limited to frequent climbing of ramps and stairs, frequent kneeling, crouching, and crawling, and occasional stooping.  (*Id.* at 143.)  He added that Olatubosun should never climb ladders, ropes, or scaffolds, and that he should avoid concentrated exposure to environmental hazards such as machinery and heights.  (*Id.* at 145.)  He noted, however, that the file contained no "treating or examining source statement(s) regarding [Olatubosun's] physical capacities."  (*Id.* at 147.)

4

Olatubosun reported several seizures to Dr. Cooper in September, October, November, and December 2006.  (*See* Tr. at 226, 301, 305.)  From January 15, 2007, to January 19, 2007, Olatubosun was admitted to the Nebraska Medical Center for "continuous video EEG monitoring for evaluation of uncontrolled seizure disorder." (*Id.* at 153.)  During his hospital stay, Olatubosun experienced "two paroxysmal spells that were not associated with any electroencephalogram changes and [were] deemed nonepileptic in nature."  (*Id.* at 154.)   His antiepileptic medications were discontinued upon his discharge, and he was directed to follow up with Dr. Cooper.  (*Id.* at 154-155.)

Olatubosun continued to report seizures following his discharge from the Nebraska Medical Center.  (Tr. at 227.)  On February 13, 2007, he visited Dr. Cooper for a follow-up. (*Id.*)  Dr. Cooper explained to Olatubosun and his wife that Olatubosun's seizures were nonepileptic, and that nonepileptic seizures were generally caused by "underlying emotional problems" rather than "true abnormal electrical activity of the brain." (*Id.*)  Dr. Cooper told them that, because Olatubosun "did not respond at all to anticonvulsant medicines, . . . his EEG was normal, his scans have been normal, and . . . Dr. Singh's report did not suggest true epileptic seizures," he should "undergo psychological evaluation." (*Id.*)  Dr. Cooper referred the Plaintiff to Dr. Gregory Keane for such an evaluation.  (*Id.* at 216, 227.)

On March 5, 2007, Dr. Keane completed an initial evaluation of Olatubosun.  (Tr. at 233.)  The evaluation begins,

Patient reports a history of severe physical and verbal abuse and traumatic events suffered in Nigeria when he was in the army for approximately 16 years.  He has a history of gunshot wounds to the head, leg and shoulders. He reports that at one point he was tortured and imprisoned by the government of Nigeria for treason.  These events involved intense fear,

5

caused him to have nightmares and flashbacks and produced psychological distress and physiological reactivity.  As a result he has had disturbances in his sleep, experienced irritability and anger outbursts, and had decreased concentration.

(*Id.*)  Dr. Keane noted that Olatubosun admitted to drinking alcohol on a daily basis–with increasing consumption during the past month–and gambling problems.  (*Id.*)  He also noted that Olatubosun's "mood is dysthymic," his "affect is constricted," his "insight is limited," his "attitude is cooperative," his "intelligence is estimated to be average," and he "has some difficulty with short-term recall."  (*Id.* at 234-35.)  Dr. Keane's diagnoses were as follows:  Axis I–Posttraumatic Stress Disorder; Major Depressive Disorder, Recurrent, Moderate; and Alcohol Abuse versus Dependence.    Axis II–Deferred.    Axis III–Hypertension; chronic headache; status post gunshot wound to the head, leg, and shoulder.  Axis IV–Severe.  Axis V–Current GAF score of 50.  (*Id.* at 235.)[1]  A treatment plan consisting of "outpatient medication management," "individual psychotherapy," and, if necessary, "inpatient psychiatric hospitalization" was developed for Olatubosun.  (*Id.*)

Olatubosun returned for a follow-up with Dr. Keane on April 16, 2007.  (Tr. at 230.)  Olatubosun reported that he was"[d]oing alright" and had consumed no alcohol during the

---

[1] "The DSM-IV-TR utilizes a multiaxial system where each of five axes 'refers to a different domain of information that may help the clinician plan treatment and predict outcome.'" *Amis v. Astrue*, No. 4:09CV1376, 2010 WL 3040265, at *18 n.18 (E.D. Mo. July 14, 2010) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. text rev. 2000)).  Axis I lists clinical disorders and other conditions that need clinical attention, Axis II lists personality disorders and mental retardation, Axis III lists general medical conditions, Axis IV concerns psychosocial and environmental problems, and Axis V consists of a Global Assessment of Functioning (GAF) Scale score.  *Id.*    "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

past 28 days.  (*Id.*)  He also reported that he suffered a seizure and had nightmares.  (*Id.*)

Dr. Keane noted that Olatubosun was well dressed and well groomed, was of "great" mood

and normal affect, and was "improving."  (*Id.*)

On May 14, 2007, Olatubosun reported to Dr. Keane that he was "[n]ot too bad," and

that his mood "depend[ed] on the situation."  (Tr. at 229.)  On June 5, 2007, he reported

that he was "OK," and his mood was depressed.  (*Id.* at 228.)  Dr. Keane noted again that

Olatubosun was "improving."  (*Id.*)

Olatubosun returned for another follow-up on October 2, 2007.  (Tr. at 335.)  He

reported suffering a seizure during the previous week, but he also reported that his mood

was "fine."  (*Id.*)  Dr. Keane noted that Olatubosun's affect was normal, his thoughts were

"goal directed" and "future oriente[d]," his concentration and sleep were "good," his insight

and judgment were "fair," and his treatment progress was "fair to improving."  (*Id.*)   A

progress note (signed by someone other than Dr. Keane[2]) states that Olatubosun "shared

feelings related to being nonproductive due to his disability," and that the  "pro's and con's

of not seek[ing] employment until SSA is approved" were "addressed."  (*Id.* at 336.)

Olatubosun did not keep his appointments with Dr. Keane in December 2007 and

January 2008.  (Tr. at 333-334.)  On February 4. 2008, Olatubosun reported having a

"[c]ouple spells," but "[n]othing serious."  (*Id.* at 331.)  His sleep was reported to be good,

though Olatubosun continued to suffer nightmares.  (*Id.*)  His mood was dysthymic, and he

reported that he "drank for three days" after his best friend died in October 2007.  (*Id.*)  He

---

[2] The signature on this note is illegible, but it is readily distinguishable from that of
Dr. Keane.  (*Compare* Tr. at 335 *with id.* at 336.)  Other similar documents will be cited as
notes made by "Dr. Keane's associate."

reported to Dr. Keane's associate that he felt frustration with himself and with the Social Security Administration about his pending application.  (*Id.* at 332.)

On March 5, 2008, Olatubosun returned to the Nebraska Medical Center for a follow-up in connection with his paroxysmal spells.  (Tr. at 280.)  Olatubosun was informed that, due to the nonepileptic nature of his seizures, the Center "would not recommend starting any antiepileptic medication," and he "does not need to follow up with our clinic."  (*Id.*)  He was instructed to follow up with Dr. Tibbels and with Dr. Keane.  (*Id.*)

On March 10, 2008, Olatubosun visited Dr. Keane and reported suffering muscle spasms.  (Tr. at 329.)  His mood was dysthymic and "empty," and his affect was "constricted."  (*Id.*)  Dr. Keane rated Olatubosun's progress as "fair."  (*Id.*)

Olatubosun returned to the Nebraska Medical Center for an evaluation on April 7, 2008.  (Tr. at 270.)  It was noted that Olatubosun was "doing about the same, averaging perhaps one [of] his 'critical' events every month or so, and a 'mild' event perhaps once a month."  (*Id.*)  His neurologic examination was normal, and his condition was found to be stable.  Olatubosun was asked to keep a record of his spells and to return in the fall for a follow-up.  (*Id.*)

On April 21, 2008, Olatubosun returned for a follow-up with Dr. Keane.  (Tr. at 326.)  He reported anxiety, mood problems, and a visit to the ER earlier that month.  (*Id.*)  He expressed concern that he might be taken back to Nigeria because he is "next in line to be king of his tribe."  (*Id.*)  His mood was euthymic and his affect was irritable.  (*Id.*)

Olatubosun visited Dr. Keane again on June 2, 2008.  (Tr. at 324.)  Dr. Keane noted that Olatubosun continued to experience anxiety and mood difficulties, but his mood was "not too bad," and his affect was normal.  (*Id.*)  In addition, however, he noted that

8

Olatubosun claimed to have predicted his mother's death in a dream. (*Id.*) He described Olatubosun's progress as "fair." (*Id.*)

Later that month, Olatubosun suffered a broken right ankle after falling during a pseudoseizure. (Tr. at 259, 375.) At the time, he reported that he was drinking approximately one six-pack of alcohol per week. (*Id.* at 260.) Records suggest that surgery was performed on the injured ankle, and during the surgery Olatubosun demonstrated "symptoms suggestive of sleep apnea." (*Id.* at 375.)

On July 19, 2008, Olatubosun called Dr. Keane and spoke with him about his "application for disability." (Tr. at 322.) Dr. Keane said that he spoke with Olatubosun's attorney about the case and "disclosed a lack of adherence to [treatment] recommenda[tions] on [Olatubosun's] part re: frequent psychotherapy sessions for treatment of Conversion Disorder and PTSD." (*Id.*) Dr. Keane added, "These recommendations have been consistently reiterated since 5/2007 and have yet to be followed . . . at a frequency (once per week or once every 2 weeks) previously discussed and believed to be most helpful for treatment of his condition." (*Id.*)

Olatubosun visited Dr. Keane on August 4, 2008, and reported that the frequency of his seizures had been decreasing since he began treatment for his sleep apnea. (Tr. at 320.) His mood was "OK," his affect "constricted," and his memory, judgment, and insight were "fair." (*Id.*)

On September 29, 2008, Olatubosun reported that he was feeling increased stress due to several factors and that he experienced a number of "episodes" during the past month. (Tr. at 316.) Nevertheless, he described his mood as "not too bad." (*Id.*) Dr.

9

Keane made adjustments to Olatubosun's medication regimen, and he directed Olatubosun to return to the clinic in one month.  (*Id.*)

On October 6, 2008, Olatubosun visited the Nebraska Medical Center for follow-up concerning his seizures.  (Tr. at 368.)  He reported suffering three "spells" since September 2.  (*Id.*)  His physician prescribed medication "for possible seizures."  (*Id.*)

On November 1, 2008, Dr. Keane completed a "Psychiatric Evaluation Form for Affective Disorders" and a "Psychiatric Evaluation Form for Anxiety Related Disorders" in connection with Olatubosun's application for disability benefits.  (Tr. at 348-363.)  On the first of these forms, Dr. Keane indicated that Olatubosun suffered from the following depressive symptoms: "anhedonia or pervasion [sic] loss of interest in almost all activities," "appetite disturbance with change in weight," "sleep disturbance," "psychomotor agitation or retardation," "decreased energy," difficulty concentrating or thinking," and "thoughts of suicide."  (*Id.* at 350.)  He also indicated that Olatubosun has "a medically documented history of a chronic Affective Disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication of [sic] psychosocial support."  (*Id.* at 353 (emphasis omitted).)  On the second form, Dr. Keane indicated that Olatubosun experienced the following symptoms: "autonomic hyperactivity," "vigilance and scanning," "restlessness," "difficulty thinking," "muscle tension," and "restless, unsatisfying sleep"–though Dr. Keane indicated that these symptoms were "more associated with Post Traumatic Stress Disorder."  (*Id.* at 356-357.)  Dr. Keane also indicated that Olatubosun experiences "recurrent and intrusive recollections of a traumatic experience that are a source of marked distress" and that are characterized by the following symptoms: "persistent avoidance of

10

stimuli related to the trauma," "efforts to avoid activities, people, or places that arouse recollections of the trauma," "markedly diminished interest or participation in significant activities," "recurrent and intrusive distressing recollections of the trauma," "recurrent and distressing dreams of the event," "acting or feeling as if the traumatic event were recurring," "flashbacks to the event," "intense psychological distress at exposure to internal or external cures [sic] that symbolize the trauma," and "physiological reactivity on exposure to internal or external cues." (*Id.* at 358-359.)  In both forms, Dr. Keane indicated that Olatubosun exhibited marked or extreme difficulty in "initiating and participating in activities independent of supervision and direction"; exhibited moderate impairment in "transportation"; exhibited marked or extreme difficulties in "cooperating with others," responding to those in authority," "holding a job," and "interacting and actively participating in group activities"; exhibited moderate impairment in "independent functioning" and "concentration"; and displayed, in "stressful circumstances," an "exacerbation of symptoms of illness," "deterioration from level of functioning," "decompensation," and "poor attendance." (*Id.* at 351-353, 359-361.)  Dr. Keane indicated that he has treated Olatubosun since March 5, 2007, that he saw Olatubosun "about every two months on average," and that Olatubosun's diagnoses were PTSD; Major Depressive Disorder, Recurrent, Moderate; Conversion Disorder; and Alcohol Abuse vs. Alcohol Dependence.  (*Id.* at 349, 356.)

Dr. Keane also completed a "Mental/Emotional Capacity Analysis for Sustained Work Activity" form on November 1, 2008, in connection with Olatubosun's application.  (Tr. at 364-366.)  The form's instructions ask for Dr. Keane to provide his assessment of the impact that Olatubosun's "mental illness has on his mental an emotional capabilities in day-to-day work settings." (*Id.* at 364.)  On the form, Dr, Keane indicated that Olatubosun's

11

abilities to "relate to co-workers," "deal with the public," "use judgment," "interact with supervisor(s)," "function independently," and "maintain attention/concentration" were "fair"; that his ability to "deal with work stresses" was "poor"; that his ability to "understand, remember and carry out complex job instructions" was "fair"; and that his abilities to "behave in an emotionally stable manner," "relate predictably in social situations," and "demonstrate reliability" were "fair." (*Id.* at 364-365.)[3] He also indicated that Olatubosun's abilities to "follow work rules" and "understand, remember, and carry out detailed, but not complex job instructions" were "good"; and that his abilities to "understand, remember, and carry out simple job instructions" and "maintain personal appearance" were "unlimited." (*Id.*)

**_Olatubosun's Testimony_**

On November 10, 2008, Olatubosun testified at the administrative hearing before the ALJ. (Tr. at 409-441.) He explained that he stopped working in March 2006 due to his seizures, which lacked clear causes or triggers. (*Id.* at 417-418.) He said that the seizures lasted for one or two minutes, but their effects–which included dizziness, nausea, and headaches–lingered for three or four days. (*Id.* at 419.) He added that in August 2006, the seizures occurred at a rate of two to three per week, but had since reduced in frequency to two to three per month. (*Id.* at 419-420.)

Olatubosun said that his PTSD caused him to "wake up with bad dreams like I'm in the war still fighting and then I wake up struggling from my sleep, sometimes talking out,

---

[3] According to the form's instructions, a rating of "fair" indicates an "ability to function that is limited but satisfactory." (Tr. at 364.) A rating of "poor" indicates an "ability to function that is seriously limited but not precluded." (*Id.*)

12

sometimes kicking . . . ."  (Tr. at 423.  *See also id.* at 429 (indicating that the Plaintiff remembers his torture when he wakes up from nightmares).)  He said that he then became agitated and sought to be alone.  (*Id.*)  He added that his agitation occurred not only after his nightmares, but also after he saw "anything war on the news" or witnessed confrontations.  (*Id.* at 423-24.)  Olatubosun testified that his depression caused him to develop significant concentration and memory problems that affected his ability to work.  (*Id.* at 428.)  He also testified that he had not consumed alcohol since January 2008.  (*Id.* at 433.)  He said that he saw Dr. Ann Moray for emotional therapy twice per week.  (*Id.* at 435-436.)

### Vocational Expert's Testimony

The ALJ asked a vocational expert ("VE"), Deborah Determan, to consider a hypothetical claimant with Olatubosun's "vocational profile" who suffered paroxysmal spells, major depressive disorder, "essential hypertension," a history of alcohol dependence, conversion disorder, moderately severe sleep apnea, mild degenerative joint disease, and posttraumatic stress disorder, and who is limited to sedentary work, cannot use air or vibrating tools, cannot work at unprotected heights, cannot work with the public,  can work with co-workers "if the contact with the co-workers is brief, superficial, and directly related to job processes," cannot work in "a team where they have to coordinate their ideas," and cannot follow complex instructions or perform complex work.  (Tr. at 445-446.)  He then asked the VE to opine whether such a person could perform any of Olatubosun's past work.  (*Id.* at 446.)  The VE responded in the negative.  (*Id.*)  The ALJ then asked the VE to consider whether a hypothetical individual with the characteristics described above who was limited to "simple one, two, or three-step work" that could "be learned in 29 days or

13

less" could perform "any jobs in the national economy." (*Id.*)  The VE responded that such a person could work as a "document preparer," a "cutter and paster," and a "change account clerk." (*Id.* at 447.)  She testified that the "incidence of work" for these jobs in "the four-state area of Nebraska, Iowa, Kansas, and Missouri" was 350 positions, 200 positions, and 1,200 positions, respectively.  (*Id.*)  She also testified that her testimony was "consistent with the DOT."  (*Id.* at 449.)

### THE ALJ'S DECISION

After following the five-step sequential evaluation process set out in 20 C.F.R. § 404.1520(a), the ALJ concluded that Olatubosun is not disabled within the meaning of the Social Security Act.  (Tr. at 14-16, 24.)  At step one, the ALJ found that Olatubosun had not engaged in substantial gainful work activity since March 23, 2006, the alleged onset date of disability.  (Tr at 16.)  At step two, the ALJ found that Olatubosun had the following "severe" impairments: paroxysmal spells, depression, posttraumatic stress disorder, essential hypertension, alcohol dependence, conversion disorder, and moderately severe sleep apnea.  (Tr. at 16.)  At step three, the ALJ found that Olatubosun did not have an impairment or combination of impairments that equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. at 17.)  At step four, the ALJ determined that Olatubosun had the residual functional capacity ("RFC") "to perform sedentary work, as defined in [20 C.F.R. § 404.1567(a)]," with the following additional restrictions:

> [T]he claimant cannot use air or vibrating tools, operate motor vehicles, or work at unprotected heights.  Due to his mental impairments, the claimant cannot work with the public or in a position requiring teamwork or coordination of ideas, but can work with co-workers if contact with them is brief, superficial, and directly related to job processes.  The claimant can work independently relating to the manipulation of products or things.  He has marked limitation in responding appropriately to complex work situations and

14

can perform only simple 1-3 step work.  Simple work is defined as work that can be learned from the simple demonstration of a job or within 29 days or less.

(Tr. at 18.)  He also found that Olatubosun was incapable of performing "any past relevant work."  (*Id.* at 22.)  At step five, the ALJ concluded that, given Olatubosun's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that [he] can perform."  (*Id.* at 23.)  Specifically, the ALJ found that Olatubosun could "perform the requirements of representative occupations as document preparer . . . cutter and paster . . . and change account clerk."  (*Id.* at 23-24.)[4]

## STANDARD OF REVIEW

The Court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the

---

[4] "Through step four of this analysis, the claimant has the burden of showing that []he is disabled."  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform."  *Id.*  As noted above, in this case the ALJ reached step five of the sequential analysis and concluded that the Plaintiff was not disabled.  (*See* Tr. at 23-24.)

Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Finch*, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

The Court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). The Court does not owe deference to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).

## DISCUSSION

Olatubosun claims that the Commissioner's decision must be reversed because: 1) "[t]he ALJ erroneously rejected the treating physician's opinion regarding the Plaintiff's limitations"; 2) the ALJ failed to evaluate the Plaintiff's mental impairments properly; 3) "[t]he hypothetical questions posed to the VE were erroneous because they did not include relevant medical evidence"; 4) "there is no corollary in the DOT for many elements of the RFC defined by the ALJ"; 5) "the DOT is outdated and inadequate to the task of identifying potential jobs available in the national economy"; and 6) "the numbers presented by the VE do not constitute a 'significant number of available jobs.'" (Filing No. 12 at 13, 17, 18, 20, 21, 22-23.) Each of the Plaintiff's arguments will be analyzed in turn.

### *The Treating Physician's Opinion*

It is clear that the ALJ's assessment of Olatubosun's RFC did not incorporate all the limitations identified by Dr. Keane on the "Psychiatric Evaluation Form for Affective Disorders" and the "Psychiatric Evaluation Form for Anxiety Related Disorders." (*Compare*

16

Tr. at 18 (describing the Plaintiff's RFC, which includes the ability to perform "sedentary work," the ability to "work with co-workers if contact with them is brief, superficial, and directly related to job processes," and the ability to "work independently relating to the manipulation of products or things") *with id.* at 20 (summarizing Dr. Keane's opinions that the Plaintiff has "marked or extreme difficulties in . . . initiating and participating in activities independent of supervision and direction," "marked or extreme difficulties in . . . cooperating with others, responding to those in authority, holding a job, and interacting and actively participating in group activities").)   In excluding certain of Dr. Keane's opinions, the ALJ explained,

> Dr. Keane's opinion is given considerable weight as he is a treating source and his opinion is consistent with the record as a whole.  However, Dr. Keane indicated that mental status examinations or tests measuring concentration were performed only periodically throughout care and his opinion is limited to his first evaluation of the claimant in March 2007.  The undersigned takes particular notice of the claimant's non-compliance with treatment recommendations, his continued alcohol use, and that the limitations indicated by Dr. Keane do not preclude the claimant's ability to perform simple work.  Although Dr. Keane indicated that the claimant demonstrated some marked or extreme difficulties at times, the evidence shows the claimant has not had marked levels of impairment on a sustained basis to establish complete disability or limitations greater than those reflected in the above residual functional capacity.

(Tr. at 20.)   Olatubosun argues that the ALJ's "rationale" for disregarding some of Dr. Keane's opinions was "insufficient," unsupported by substantial evidence, and contrary to the applicable regulation (i.e., 20 C.F.R. § 404.1527(d)).   (Filing No. 12 at 13.)   The Court disagrees.

"The opinion of a treating physician is accorded special deference under the social security regulations," and is "normally entitled to great weight."  *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir.

17

2000)).  Indeed, a treating physician's opinion "will be granted controlling weight when [it is] well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record."  *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (citing, *inter alia*, 20 C.F.R. § 404.1527(d)(2)).  Nevertheless, an ALJ may discount a treating physician's opinion under certain circumstances.  For example, a treating physician's opinion may be given reduced weight if other medical assessments are supported by superior medical evidence or if the treating physician has offered an inconsistent opinion.  *See Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007); *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001).  *See also Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (noting that the ALJ must "resolve conflicts among 'the various treating and examining physicians'").  In any case, "[w]hen an ALJ discounts a treating physician's opinion, he should give good reasons for doing so."  *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

Although the ALJ's RFC assessment does not include some of the limitations identified by Dr. Keane on two of the forms that he completed in connection with this case, the assessment is consistent with the opinions expressed by Dr. Keane on the "Mental/Emotional Capacity Analysis for Sustained Work Activity" form.  On this form, Dr. Keane opined that Olatubosun had a "fair" (i.e., "limited but satisfactory") ability to interact with supervisors, relate to co-workers, deal with the public, function independently, use judgment, and maintain attention and concentration in a day-to-day work setting.  (Tr. at 364.)  Dr. Keane also opined that Olatubosun's ability to understand, remember, and carry out detailed (but not complex) job instructions was "good," and his ability to understand, remember, and carry out simple job instructions was "unlimited."  The ALJ found that

18

Olatubosun lacked the ability to "work with the public or in a position requiring teamwork or coordination of ideas," but that he could "work with co-workers if contact with them is brief, superficial, and directly related to job processes."  (Tr. at 18.)  He also found that Olatubosun "could work independently relating to the manipulation of products or things," but he could "perform only simple 1-3 step work" and "has marked limitation in responding appropriately to complex work situations."  (*Id.*)  The Court finds that the ALJ's RFC assessment affords due weight to the opinions expressed by Dr. Keane–particularly those expressed on the "Mental/Emotional Capacity Analysis for Sustained Work Activity" form. To the extent that the opinions expressed by Dr. Keane on the various forms are in conflict, the task of resolving such conflicts falls to the ALJ–and the Court cannot say that the ALJ's decision to credit Dr. Keane's assessment of Olatubosun's ability to function in work settings was erroneous.[5]

The Plaintiff argues that Dr. Keane's finding that Olatubosun's mental impairments caused certain "marked" limitations and his determination that Olatubosun has a "poor" ability to deal with "work stresses" are "fully supported by the record."  (Filing No. 12 at 14.) The Court agrees.  It does not follow, however, that those opinions establish that Olatubosun's mental impairments "preclude all work."  (*Id.*)  On the contrary, and as explained above, the ALJ's RFC assessment is consistent with Dr. Keane's opinions about Olatubosun's ability to function in a day-to-day work setting.  The Court finds that the RFC

---

[5] It should be noted that in some respects, the ALJ's RFC findings are more restrictive than Dr. Keane's assessment.  (*Compare* Tr. at 18 ("Due to his mental impairments, the claimant cannot work with the public") *with id.* at 364 (indicating that, in Dr. Keane's opinion, Olatubosun's ability to work with the public on a day-to-day basis is "fair").)

assessment is supported by substantial medical evidence in the record, and reversal is not warranted even if a different conclusion could also be drawn from the record.

On a related matter, the Plaintiff suggests that because "every job creates 'work stress,'" Dr. Keane's assessment that Olatubosun had a poor ability to deal with work stress precludes him from performing "[a]ny job which does not provide special accommodations." (Filing No. 12 at 15.) Olatubosun's argument is undermined by the fact that a rating of "poor" is defined to mean that a given ability "is seriously limited *but not precluded*." (Tr. at 364 (emphasis added).) In any event, the Court is persuaded that the ALJ's RFC assessment properly accounts for Olatubosun's limited ability to deal with work stresses by restricting his contacts with co-workers, limiting the complexity of the work he can perform, and eliminating his contact with the public.

The Plaintiff also argues that the ALJ impermissibly "substituted his own opinion for that of the treating physician." (Filing No. 12 at 15.) More specifically, Olatubosun argues, "The ALJ rejected Dr. Keane's opinion because the ALJ believed: the Plaintiff was non-compliant with treatment recommendations; he continued to use alcohol; and the limitations indicated by Dr. Keane did not eliminate the ability to perform 'simple work.' In reaching these conclusions, the ALJ used his own medical judgment and performed an analysis beyond his competence." (*Id.* at 15-16.)

The ALJ's decision does not clearly indicate how or why Olatubosun's treatment compliance and alcohol usage should affect the weight afforded to Dr. Keane's opinions. The ALJ does not claim, for example, that Dr. Keane's opinions were inconsistent with record evidence on these points. This deficiency in opinion-writing does not merit reversal, however, because it has no bearing on the outcome. *E.g. Owen v. Astrue*, 551 F.3d 792,

20

801 (8th Cir. 2008).  The ALJ did not "reject" Dr. Keane's opinion, as Olatubosun claims;

rather, he concluded that it was entitled to "considerable weight."  (Tr. at 20.)  The ALJ also

noted–correctly–that "the limitations indicated by Dr. Keane do not preclude the claimant's

ability to perform simple work."  (*Id.*)  As explained above, the ALJ formulated an RFC that

is consistent with the opinions expressed by Dr. Keane on the "Mental/Emotional Capacity

Analysis for Sustained Work Activity" form and with the record as a whole, and it was the

ALJ's prerogative to resolve any conflicts among Dr. Keane's opinions in light of the entire

record.  In any case, it is clear that the ALJ did not substitute his opinion for that of Dr.

Keane.

In summary, the Court finds that the ALJ did not "erroneously reject[] the treating

physician's opinion regarding the Plaintiff's limitations."  (Filing No. 12 at 13.)

### The Evaluation of Mental Impairments

The Plaintiff argues that the ALJ failed to evaluate properly Olatubosun's mental

impairments in accordance with 20 C.F.R. § 404.1520a.  (*See* Filing No. 12 at 17-18.)  The

Court is not persuaded.

Section 404.1520a requires Social Security officials to apply a "special technique"

to "evaluate the severity of mental impairments."  The official must rate "three functional

areas" (i.e., "activities of daily living," "social functioning," and "concentration, persistence,

or pace") using a five-point scale (i.e., none, mild, moderate, marked, and extreme) and a

fourth functional area (i.e., "episodes of decompensation") using a four-point scale (i.e.,

none, one or two, three, and four or more).  20 C.F.R. § 404.1520a(c)(4).  After rating "the

degree of functional limitation resulting from [the] impairment(s)," the official "determine[s]

the severity of [the] mental impairment(s)," decides whether the impairments meet or equal

21

a listed mental disorder, and, at "the administrative law judge hearing" level, records "the presence or absence of the criteria and the rating of the degree of functional limitation in the decision." *Id.* § 404.1520a(d)(1)-(2).  Then, if necessary, the official must assess the claimant's residual functional capacity.  *Id.* § 404.1520a(d)(3).

As suggested above, an ALJ's written decision must document the application of this technique.  *Id.* § 404.1520a(e).  More specifically, "The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)," and it "must include a specific finding as to the degree of limitation in each of the functional areas described [above]."  *Id.* § 404.1520a(e)(2).

Olatubosun concedes that "[t]he ALJ did use the five-point scale to analyze some of the medical evidence at step 3."  (Filing No. 12 at 18.)  It is also clear that the ALJ properly documented his application of the technique at step three.  (*See* Tr. at 17-18.) Olatubosun argues, however, that the ALJ "never analyzed the specific functional effects in the required areas when he formulated the RFC."  (*Id.* at 18.)  In other words, the Plaintiff claims that the ALJ erred by not repeating his application and documentation of the technique described in section 404.1520a when he proceeded to step four of the sequential evaluation process.  (Filing No. 12 at 18 ("[I]t was error for [the ALJ] to fail to specify the level of impairments which exist in all the other required areas, i.e., whether each was 'mild,' 'moderate,' or 'marked.'  Therefore, his findings do not confirm with 20 C.F.R. §§ 404.1520a . . . and the documentation of findings requirement set forth at 20 C.F.R. §§ 404.1520a(e)(2) . . . .").

The Plaintiff's argument is without merit. As the ALJ properly noted in his decision, steps four and five of the sequential evaluation process do not call for a repetition of the record made in connection with steps two and three; rather, steps four and five call for "a more detailed assessment" of various functions within the four broad functional areas cited in section 404.1520a. (*See* Tr. at 18 (citing SSR 96-8p).) *See also* 20 C.F.R. § 404.1520a(d) (explaining that the ratings of functional limitations are used to determine whether an impairment is severe (step two) and whether it meets or equals a listed mental disorder (step three) before an assessment of RFC is made); Social Security Ruling (SSR) 96-8p, at *4 (explaining that "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment" than that described in 20 C.F.R. 404.1520a and used at steps two and three). The ALJ's decision includes such a detailed assessment. (*See* Tr. at 18-22). There is no error.

### The Hypothetical Question Posed to the VE

Olatubosun argues next that the ALJ erred by not including all of the limitations identified by Dr. Keane in the key hypothetical question presented to the VE. (Filing No. 12 at 18.) The Plaintiff adds, "In light of Dr. Keane's assessment of 'marked' impairments, there is no way the Plaintiff could perform [certain] functions [that the] SSA has deemed essential to even simple, unskilled work," including maintaining regular attendance, sustaining an ordinary routine without special supervision, working in with co-workers, accepting instructions, and responding appropriately to criticism. (*Id.* at 19-20.)

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quoting *Hinchey v. Shalala*, 29 F.3d

428, 432 (8th Cir. 1994)).   "Moreover, the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments."   *Id.* (citation omitted). Here, the hypothetical question included all of the limitations set forth in the ALJ's RFC assessment.   The RFC assessment, in turn, captured the "concrete consequences" of Olatubosun's impairments as described by Dr. Keane in the "Mental/Emotional Capacity Analysis for Sustained Work Activity" form and as illustrated by the medical record as a whole.   Furthermore (and as explained above), to the extent that Dr. Keane expressed inconsistent opinions elsewhere in the record, the ALJ did not err in discounting those opinions when formulating the Plaintiff's RFC.   In summary, because the ALJ's RFC findings are supported by substantial evidence, and because the hypothetical question incorporated those findings, "[t]he hypothetical question was . . . proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits." *Lacroix*, 465 F.3d at 889.

**Discrepancies Between the VE's Testimony and the DOT**

Citing Social Security Ruling 00-4p,[6] Olatubosun argues that the Commissioner's decision must be reversed because there are unresolved "conflicts between the [Dictionary of Occupational Titles (DOT)] and the VE's testimony." (Filing No. 12 at 21.) More precisely, Olatubosun claims that because the ALJ included limitations in his RFC that are not addressed in the DOT, the VE's testimony is not consistent with the DOT, and the ALJ erred by failing to resolve these inconsistencies. For example, Olatubosun complains that the VE failed to explain "whether or how" the DOT accounts for the ALJ's findings that the Plaintiff cannot "perform in a position requiring teamwork or coordination of ideas" and that he can "work with others only if the contact is brief, superficial and directly related to job processes." (Filing No. 12 at 21.) He adds that the VE also failed to explain why the positions she identified are consistent with the ALJ's finding that Olatubosun can handle only 1-3 step tasks. (*Id.*)

As the Defendant correctly notes, "[T]his is not a situation where the vocational expert has testified that a claimant can perform a job despite having a limitation that would, under the DOT description, preclude the ability to perform the job." (Filing No. 12 a 21.) Rather, the VE testified that a hypothetical claimant could perform certain jobs, but the DOT

---

[6] This Ruling states, in part, as follows.

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, at *2.

description of those jobs simply does not address all of the same limitations that were included in the ALJ's hypothetical.  This Court has previously considered and rejected the argument that under these circumstances, a "conflict" arises between a VE's testimony and the DOT.  *See Murphy v. Astrue*, No. 8:09CV89, 2009 WL 3763673, at *10 (D. Neb. Nov. 9, 2009) ("[W]here specific limitations are placed on a claimant's ability to perform a job, an ALJ's conclusions are based on a 'perfectly acceptable basis.'  Therefore, conflicts do not exist." (quoting *Jones v. Chater,* 72 F.3d 81, 81 (8th Cir. 1995)) (citation omitted)).  "In this case, the VE responded to a hypothetical specific to [Olatubosun's] facts, and there was no conflict between the VE's testimony and the DOT."  *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007).  Because the ALJ's hypothetical question included all of Olatubosun's limitations that were identified in the RFC assessment, and because the VE limited her opinion to the subset of jobs that fell within the Plaintiff's RFC, it was proper for the ALJ to rely on the VE's opinion.  *See id.*

### The DOT's Adequacy as a Source of Potential Jobs

Olatubosun argues next that the DOT "is outdated" and contains numerous "errors and deficiencies."  (Filing No. 12 at 21-22.)  He claims that, due to these deficiencies, the Commissioner cannot rely upon the DOT to "satisfy the requirements of Step Five of the sequential evaluation process."  (*Id.* at 22.)  The Court rejects this argument for the reasons stated in *Murphy v. Astrue*, No. 8:09CV89, 2009 WL 3763673, at *10 (D. Neb. Nov. 9, 2009) (citing, *inter alia*, 20 C.F.R. § 404.1566(d)(1)).  The DOT is a primary source "of reliable job information" that is used routinely by the Commissioner when determining whether suitable jobs exist in the regional economy.  20 C.F.R. § 404.1566(d).  It was not error for the Commissioner to rely upon the DOT in satisfying his burden at step five.

26

*The Number of Available Jobs*

Finally, Olatubosun argues that the ALJ erred in finding that there are a significant number of positions that Olatubosun can perform in the State of Nebraska.  (Filing No. 12 at 23.)

It is true that at step five of the sequential analysis, the Commissioner bears the burden of showing that the claimant can perform jobs that exist in significant numbers. *E.g., Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997).

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling [sic] to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.  The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (quoting *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

In this case, the VE testified that Olatubosun could work as a document preparer (350 jobs in the region, 6,600 jobs nationally), a cutter and paster (200 jobs in the region, 5,500 jobs nationally), and a change account clerk (1,200 jobs in the region, 17,000 jobs nationally).  (*See* Tr. at 447.)  The Plaintiff notes that, "assuming equal distribution" of jobs among the four states included in the region, there are only approximately 437 suitable jobs available to Olatubosun in Nebraska.  (Filing No. 12 at 23.)  Although he concedes that there is "no 'bright line' definition of 'significant,'" Olatubosun submits that 437 jobs "do[es] not come close to any ranges discussed in Eighth Circuit or other circuit's cases."  (*Id.*)  In fact, however, the Eighth Circuit has found that 200 suitable jobs in the claimant's home

27

state of Iowa constituted "a significant number."  *Johnson v. Chater*, 108 F.3d 178, 180 &

n.3 (8th Cir. 1997).[7]  Therefore, to the extent that the Plaintiff suggests that 437 jobs is

insufficient as a matter of law, his argument must be rejected.

Olatubosun argues in the alternative that "the numbers cited by the VE" are

insufficient "in the context of the total job pool."  (Filing No. 12 at 24 (citing *Crabtree v.*

*Secretary of HHS*, No. 5:89CV2081, 1991 WL 65536 (N.D. Ohio Feb. 14, 1991)).)  The

Plaintiff calculates that the total civilian workforce totals 932,270 in Nebraska, that "the 87.5

document preparer jobs identified by the VE constitute .0000938 of such jobs in Nebraska;

the 50 cutter and paster jobs constitute .0000536 of the positions in Nebraska; and the 300

charge [sic] account clerks constitutes .0003217."  (*Id.*)  He then notes that *Crabtree*, the

court concluded that "485 jobs in this local economy, constituting .0004% of the local

existing employment opportunities, . . . [does] not represent work which exists in significant

numbers," 1991 WL 65536, at *2, and he submits that the "even smaller percents [sic] of

.0000938, .0000536 and .0003217 are clearly also not 'significant,'" (Filing No. 12 at 24.)

Preliminarily, the Court notes that the Plaintiff has made a computational error by

failing to convert the ratios he cites into percentages of the total Nebraska workforce.

According to the Plaintiff's numbers, the number of positions identified by the VE amounts

to approximately 1 / 2131, or 0.0004691, of the total Nebraska workforce (0.0000938 +

0.0000536 + 0.0003217 = 0.0004691; alternately, 437.5 / 932270 = approximately

---

[7] The Court notes in passing that in *Johnson*, the VE testified that the "200 jobs of addresser or document preparer in Iowa" were "representative of a larger category of jobs that Johnson could perform."  108 F.3d at 180.  Similarly, in the instant case the VE testified that the three types of jobs she identified were "*some examples* of occupations that would be consistent with [the ALJ's] hypothetical."  (Tr. at 447 (emphasis added).)

0.000469), which, when expressed as a percentage of the available workforce, equals 0.04691% (0.0004691 x 100).   Thus, in this case the percentage of the "existing employment opportunities" that Olatubosun is capable of filling (i.e., 0.04691%) is approximately *100 times greater* than the percentage that the court found to be insufficient in *Crabtree* (i.e., 0.0004%).  In short, *Crabtree* does not support the Plaintiff's argument that the number of suitable jobs identified by the VE is insufficient.

In any event, the Court is not persuaded that the type of analysis set forth in *Crabtree* is particularly enlightening.  After considering the criteria set forth in *Jenkins*, the Court finds that the number of jobs identified by the VE is significant given the circumstances presented here.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision denying benefits is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and a separate Judgment in favor of the Defendant will be entered.

DATED this 17th day of September, 2010.

BY THE COURT:

S/Laurie Smith Camp
United States District Judge

29